## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## SAVANNAH DIVISION

| | | |
|---|---|---|
| MARY MCCLEOD, | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **CIVIL ACTION NO.** |
| vs. | : | **4:13-CV-00057** |
| | : | |
| NATIONAL RAILROAD PASSENGER | : | |
| CORPORATION d/b/a AMTRAK | : | |
| NATIONAL PASSENGER CORP. | : | |
| (AMTRAK), | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

### BRIEF IN SUPPORT OF DEFENDANT'S
### MOTION FOR SUMMARY JUDGMENT

Defendant National Railroad Passenger Corporation ("Amtrak") submits the

following Brief in Support of its Motion for Summary Judgment.  As set forth below,

summary judgment should be granted on all claims asserted by the Plaintiff.

### INTRODUCTION

On March 8, 2011, the Plaintiff was a passenger onboard an Amtrak train

traveling from Washington, D.C. to Savannah, Georgia.  The train departed Washington,

D.C. at approximately 7:00 p.m. and was scheduled to arrive in Savannah the next

morning.  Sometime after midnight, Plaintiff needed to go to the restroom.  Plaintiff

needed to go urgently and could not wait due to the fact that she is incontinent, a fact that

was not disclosed to Amtrak prior to the incident.  Plaintiff did not seek assistance from

any Amtrak employees or other passengers, but instead attempted to walk the short

distance from her seat to the restroom using her cane.  The Plaintiff fell and sustained injuries as she attempted to walk to the restroom.

Plaintiff alleges claims for negligence, negligence *per se* and violation of the Americans with Disabilities Act ("ADA") and the Rehabilitation Act ("RA").  Summary judgment should be granted on all of Plaintiff's claims.  With respect to Plaintiff's negligence claim, Amtrak had no notice that Plaintiff needed to use the restroom or that she had incontinence, which caused her to need to go urgently.  Therefore, Amtrak was not aware that Plaintiff needed assistance until after her fall.  Plaintiff's negligence *per se* claim should also be dismissed because the ADA's purpose is to prevent discrimination against persons with disabilities, not to prevent personal injuries.  Finally, Plaintiff has not identified a single act or omission by Amtrak that constitutes a violation of the ADA or RA.

## FACTUAL BACKGROUND

Plaintiff is a 78-year-old female who is 5' 4" and weighs 217 pounds.  (Deposition of Plaintiff Mary McCleod, pp. 5, 76, 84).  At the time of the incident, Plaintiff suffered from numerous health conditions, including diabetes, high blood pressure, back pain, incontinence, and arthritis in her knees and back.  (Plaintiff dep., pp. 14-20, 34-37, 48-49; Deposition of Felicia Audain, p. 17-18).  Plaintiff's health issues do not prevent her from being able to tell someone when she needs to go to the restroom or when she needs help going to the restroom.  (Audain dep., p. 53).  Plaintiff also had balance issues, which she described as similar to vertigo, that caused her to fall numerous times prior to the accident.  (Plaintiff dep., pp. 19-20).  Plaintiff attributes some of her falls to chronic back

pain.  (Plaintiff dep., pp. 32-36).  In order to walk without falling, Plaintiff is required to use a cane or walker.  (Plaintiff dep., pp. 30-31, 36-37).  She also has a wheelchair and Hoveround at her home in Savannah.  (Plaintiff dep., p. 73).  Plaintiff lives with two of her children in Savannah because she is "not able to live by [her]self[.]"  (Plaintiff dep., p. 19).

Approximately one month before the incident, Plaintiff traveled onboard an Amtrak train from Savannah to Washington, D.C. to visit one of her daughters, Felicia Audain.  (Plaintiff dep., p. 26; Audain dep., p. 16).  Plaintiff boarded the train in Savannah without assistance at approximately 6:00 a.m. and arrived in Washington, D.C. that night.  (Plaintiff dep., pp. 26-27).  During the trip, Plaintiff safely walked to and from the restroom without assistance from any Amtrak employees.  (Plaintiff dep., pp. 26-28, 37-38).  Amtrak employees periodically walked through Plaintiff's car on the trip from Savannah to Washington, D.C., but Plaintiff "didn't ask nobody to help me do anything[.]"  (Plaintiff dep., p. 80).

The decision to return to Savannah onboard a train rather than an airplane was made by the Plaintiff.  (Audain dep., p. 59).  Plaintiff also chose to ride in a coach car rather than a sleeper car.  (Audain dep., p. 64).  Plaintiff's return ticket on Amtrak was purchased by Audain using her telephone.  (Audain dep., pp. 28-29).  Plaintiff does not know what assistance, if any, Audain requested during the phone call with Amtrak. (Plaintiff dep., p. 40).

Audain testified that she told the Amtrak employee over the phone that the Plaintiff had difficulty walking "very far" and was told that a wheelchair would be

provided to the Plaintiff at the station in Washington, D.C. and that the wheelchair would travel to Savannah with the Plaintiff. (Audain dep., pp. 29-33). Audain does not recall whether she was told that her mother would remain in the wheelchair during the trip. (Audain dep., p. 32). Audain also does not recall whether she discussed that the Plaintiff would need assistance going to the restroom during the trip. (Audain dep., pp. 50-53).

On March 8, 2011, the Plaintiff was driven to Union Station in Washington, D.C. by Audain and Audain's son. (Audain dep., p. 38). Because of traffic, they did not arrive at the station until shortly before the train was scheduled to depart. (Audain dep., pp. 38-40). The Plaintiff safely walked from the car to the ticket counter using her cane. (Audain dep., pp. 41-42). At the ticket counter, Audain told the Amtrak employee that they "ordered a wheelchair." (Audain dep., pp. 44-48). This was the only information provided by Audain to the ticket agent regarding the Plaintiff's needs during the trip. (Audain dep., pp. 44-48). Audain did not question why Plaintiff's ticket did not indicate the Plaintiff was disabled. (Audain dep., p. 47).

The Plaintiff was subsequently taken to the train in a wheelchair by an Amtrak employee. (Audain dep., p. 47). Audain did not have any communications with this employee about the Plaintiff's needs during the trip. (Audain dep., p. 49). Audain testified that when she put the Plaintiff on the train, she was comfortable that the Plaintiff could make the trip without a companion to assist her. (Audain dep., p. 65). Audain would "absolutely" have gone with Plaintiff or made other arrangements if she was not comfortable that Plaintiff could travel without a companion. (Audain dep., p. 65).

-4-

Plaintiff was assisted onto the train by a train attendant.  (Plaintiff dep., pp. 41, 46).  She did not ask to remain in the Amtrak wheelchair that was used to transport her from the ticket counter to the train.  (Plaintiff dep., pp. 47-48).  Plaintiff was told to sit in a seat on the front row, closest to the restroom.  (Plaintiff dep., pp. 46-47).  After she was seated on the train, Plaintiff spoke to Audain using her cell phone, which she had with her on the train.  (Audain dep., p. 53-54).

Plaintiff admits that she did not ask for any assistance after she was seated on the train.  (Plaintiff dep., p. 47 ("I didn't ask for nothing when I got on the train that I recall.")).  Once she was seated on the train, Plaintiff testified as follows regarding her needs:

> Q:      Did you feel like you needed special assistance for any reason?
>
> A:      Yes, I definitely needed it to get to the train because that was too far.
>
> Q:      But once you got on the train, you thought you could do everything you needed to do on the train by yourself?
>
> A:      Well, I don't know of anything I - did I need any assistance after I got on the train?
>
> Q:      Yes, ma'am.
>
> A:      That's what you're asking?
>
> Q:      That's what I'm asking.
>
> A:      **No.  I was good.**

(Plaintiff dep., p. 50) (emphasis added).

-5-

Plaintiff's train departed Washington, D.C. at approximately 7:00 p.m.  (Plaintiff dep., p. 49).  During the trip, Plaintiff recalls that the conductor checked her ticket. (Plaintiff dep., p. 51).  Plaintiff did not notify the conductor that she may require assistance going to the restroom or that her incontinence may cause her to need to use the restroom urgently.  (Plaintiff dep., p. 51).

The Plaintiff read and slept during the trip prior to her incident.  (Plaintiff dep., pp. 51-52).  At some point in time, the Plaintiff needed to go to the restroom urgently. (Plaintiff dep., pp. 51, 57).  The incident report prepared by conductor Bradley Williams states that the Plaintiff's fall occurred at 12:35 a.m.  (Deposition of Bradley Williams, p. 77; Exhibit 4 to Williams dep.).  The Plaintiff testified that she was "not going to be able to hold it" if she did not go to the restroom immediately.  (Plaintiff dep., p. 57). Plaintiff then got up from her seat and safely walked to the restrooms near her seat using her cane.  (Plaintiff dep., pp. 52-54).  The first restroom that Plaintiff checked was locked, so she turned to check the other restroom to her right.  (Plaintiff dep., pp. 52-54). As Plaintiff moved between the restrooms, she fell to the ground and sustained injuries. (Plaintiff dep., pp. 52-57).  Plaintiff contends that she fell because the train rocked. (Plaintiff dep., pp. 52-57).

Bradley Williams was the conductor onboard Plaintiff's train from Washington, D.C. to Savannah.  Williams has been a conductor or assistant conductor for Amtrak since 1999.  (Deposition of Bradley S. Williams, pp. 5, 7-8).  Jarad Jackson was the assistant conductor onboard the train.  (Deposition of Jarad Jackson, p. 5).  Jackson has been an assistant conductor for Amtrak since 2009.  (Jackson dep., p. 5).

When a passenger is provided with an Amtrak-owned wheelchair in the station, the passenger is required to return the wheelchair before boarding the train.  (Williams dep., pp. 25-26, 28).  Williams testified that he is not aware of any instance where a passenger has been allowed to remain in an Amtrak wheelchair after the train departs from the station.  (Williams dep., pp. 25, 28-29).  Plaintiff's expert on Amtrak's rules and procedures, Robert J. Meizinger, also testified that he was not aware of any instance where a passenger was allowed to use an Amtrak-owned wheelchair.  (Deposition of Robert J. Meizinger, pp. 71-72).  When a disabled passenger or a passenger with special needs is seated on the train, they are seated in handicap accessible seats, which are the seats located closest to the restroom.  (Williams dep., p. 30; Jackson dep., pp. 10-12).[1] The train crew places a notice above the passenger's seat if the passenger requires special assistance.  (Williams dep., pp. 34-36, 85; Jackson dep., p. 14; Deposition of Lauren Anderson, p. 47).  The conductor also has notice of any special requests or instructions for the passenger on the passenger manifest.  (Williams dep., pp. 20-23, 36-37; Jackson dep., pp. 17-18).[2]

After the train departs, the conductor does a ticket sweep to collect tickets in all of the cars.  (Williams dep., p. 39).  An announcement is made over the train's public

---

[1]According to the Plaintiff's testimony, she was seated in the handicap seats as described by Williams and Jackson.  (Plaintiff dep., pp. 46-47; Williams dep., p. 31; Jackson dep., pp. 18-19).

[2]The passenger manifest for Plaintiff's train is not available because they are not retained for very long after the completion of the trip.  However, Amtrak's records indicate that Plaintiff requested a "Meet and Assist," which means that an Amtrak station employee would assist her to the train in Washington, D.C. and as she deboarded the train in Savannah.

address system prior to 10:00 p.m. that provides the passengers with information about the trip and what to do in the event the passenger needs assistance.  (Williams dep., pp. 40-43, 65-66; Anderson dep., pp. 41-44).  The train crew relies on the passenger to inform them of the passenger's needs during the trip, such as whether they will require assistance to the restroom.  (Williams dep., pp. 49-51; Anderson dep., pp. 60, 66).  In addition to the initial ticket sweep and the public address announcement, either the conductor or the assistant conductor walks through each car every twenty to thirty minutes.  (Williams dep., pp. 62-63, 66-67; Jackson dep., pp. 34).

Amtrak's employees receive training on a yearly basis on dealing with disabled and special needs passengers.  (Jackson dep., pp. 31-32; Deposition of Jacqueline Clark, pp. 52-53).  Plaintiff's expert on Amtrak's rules and procedures testified that Amtrak, as well as the other railroads, provides extensive training on its rules to its employees throughout their employment.  (Meizinger dep., p. 14).  On at least one occasion, Jackson testified that the training was conducted by disabled persons.  (Jackson dep., p. 32).  Amtrak's employees are also required to keep a copy of the service manual onboard the train at all times.  (Jackson dep., pp. 6-7).

## STANDARD OF REVIEW

Summary judgment is appropriate on each claim where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).  A dispute about a material fact is genuine only if "a reasonable jury could return a verdict for the non-moving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment, the moving party has no burden other than "pointing out to the district court...that there is an absence of evidence to support the plaintiff's case." *Celotex Corp.*, 477 U.S. at 325.  To survive summary judgment, the non-moving party must present substantial evidence to demonstrate that a triable issue of fact exists.  *Combs v. Plantation Patterns*, 106 F.3d 1519, 1526 (11th Cir. 1997).  Plaintiff must provide "more than a mere scintilla of evidence...there must be a substantial conflict in evidence to support a jury question."  *Id*.  In this case, there are no genuine issues of material fact to allow Plaintiff's claims to proceed to trial.  Therefore, summary judgment should be granted in Defendant's favor on all of Plaintiff's claims.

## ARGUMENT AND CITATION OF AUTHORITY

**I.      Summary Judgment Should be Granted on Plaintiff's Claim for Violation of the Americans with Disabilities Act and the Rehabilitation Act.**

**A.      The ADA and RA.**

"To state a claim under Title II of the ADA, a plaintiff must allege: (1) that he is a 'qualified individual with a disability;' (2) that he was 'excluded from participation in or...denied the benefits of the services, programs, or activities of a public entity' or otherwise 'discriminated [against] by such entity;' (3) 'by reason of such disability.'" *Shotz v. Cates*, 256 F.3d 1077, 1079 (11th Cir. 2001) (quoting 42 U.S.C. §12132).  "The RA contains the additional requirement that the plaintiff show the program or activity from which he is excluded receives federal assistance."  *Randolph v. Rodgers*, 170 F.3d 850, 858 (8th Cir. 1999).  Because claims brought pursuant to Title II of the ADA and the RA are "essentially identical," a court should "consider the two statutes

simultaneously[.]" *Everett v. Cobb County School District*, 138 F.3d 1407, 1409 (11th Cir. 1998).

In addition to proving that the plaintiff was discriminated against in some manner, the plaintiff must show that the discrimination was intentional in order to recover compensatory damages. *Liese v. Indian River County Hosp. Dist.,* 701 F.3d 334, 344–48 (11th Cir. 2012); *Saltzman v. Board of Commissioners of North Broward Hospital District*, 239 Fed. Appx. 484, 487 (11th Cir. 2007); *Vosburgh v. Humphrey,* 2014 WL 533493, *5 (M.D. Ga. Feb. 7, 2014). In the Eleventh Circuit, "intentional discrimination" is properly evaluated under the standard of "deliberate indifference." *See Liese*, 701 F.3d at 344–48.

> [D]eliberate indifference requires knowledge that a federally protected right is likely to be harmed and a failure to act upon that likelihood. Negligence, even if gross, cannot constitute deliberate indifference. For conduct to be deliberately indifferent, there must be both knowledge of likely harm and failure to act on the part of a policy maker, that is, someone capable of making an "official decision" on behalf of the organization.

*Saltzman,* 239 F.3d at 487-488 (internal citations omitted). "[A]n official is someone who enjoys substantial supervisory authority within an organization's chain of command so that, when dealing with the complainant, the official had complete discretion at a 'key decision point' in the administrative process." *Liese,* 701 F.3d at 350. "[T]he purpose of the 'official' requirement is to ensure that an entity is only liable for the deliberate indifference of someone whose actions can fairly be said to represent the actions of the organization." *Id.*

-10-

As set forth below, Plaintiff's claim under the ADA should be dismissed because there is no evidence of intentional discrimination or that the ADA was violated.

**B.      There Is No Evidence That Any Provision Of The ADA Was Violated.**

Plaintiff cannot show that she was denied the services of Amtrak based on her disability as she was allowed to ride on the train to Savannah.  Therefore, Plaintiff must show she was "otherwise discriminated [against.]"  *Shotz*, 256 F.3d at 1079. Plaintiff claims in her Complaint and through her expert, Ned B. Einstein, that the ADA was violated as follows: (1) by not informing Plaintiff that assistance to the restroom was available (Amended Complaint (Doc. 28), ¶¶ 46, 49); (2) by not informing Plaintiff that the decision to transfer from an Amtrak-owned wheelchair to a seat was hers (Amended Complaint, ¶¶ 47, 48, 50); (3) by not assisting Plaintiff to the restroom (Amended Complaint, ¶¶ 49, 51, 52); (4) by maintaining a policy that requires a passenger to be accompanied by a caregiver if the passenger cannot tend to his or her most basic needs, such as eating, using the restroom and taking medication (Einstein dep., pp. 94-105); (5) by not allowing companions of disabled passengers to purchase a ticket at a 50% discount (Einstein dep., pp. 105-11); (6) by not providing the Plaintiff with a call button or some other means to summon assistance from the train crew (Amended Complaint ¶ 53; Einstein dep., pp. 111-117); (7) by failing to provide a readily accessible restroom on the Plaintiff's car (Amended Complaint, ¶ 40; Einstein dep., pp. 165-71); and (8) by failing to train its employees to proficiency.  (Amended Complaint, ¶ 55; Einstein dep., pp. 172-73).  As set forth below, none of these allegations constitute a violation of the ADA.

**1.    Amtrak Did not Violate the ADA by Not Informing Plaintiff that Assistance to the Restroom was Available.**

Plaintiff alleges that Amtrak's employees did not inform Plaintiff that they could assist her to the restroom and that the failure to inform her that such assistance was available violated the ADA.  (Amended Complaint, ¶¶ 46, 49).  The ADA, however, does not require Amtrak to assist disabled passengers to the restrooms, nor does it require Amtrak to inform passengers that such assistance is available.  *See generally* 49 C.F.R. Part 37; *see also Katzowitz v. Long Island Railroad,* 58 F. Supp. 2d 34, 39 (E.D. N.Y. 1999) ("The plaintiff simply has not established that there is anything in the [ADA] that provides that [commuter authorities] must guess what special services, or the extent of those services, a handicapped passenger requires."); *Adiutori v. Sky Harbor Intern. Airport,* 880 F. Supp. 696, 705 (D. Az. 1995) ("The ADA ... does not require that assistance be automatically given to persons like the plaintiff; it requires only that appropriate assistance be given on an as requested and on an as needed basis."). Therefore, Amtrak's alleged failure to inform Plaintiff that its employees could assist her to the restroom does not constitute a violation of the ADA.

**2.    Amtrak Did Not Violate The ADA By Not Providing Plaintiff With A Wheelchair For Her Trip.**

Plaintiff alleges that Amtrak violated the ADA by (1) not allowing her to use an Amtrak-owned wheelchair during her trip pursuant to its duty under 49 C.F.R. § 37.5(f) to make "reasonable modifications" and "provid[e] auxiliary aids and services," and (2) not informing her that the decision to transfer from the Amtrak-owned wheelchair to a seat was her decision.  (Amended Complaint, ¶¶ 47-48).  Neither of these allegations has

-12-

any merit.  First, 49 C.F.R. § 37.5(f) does not apply to Amtrak as the subsection states that it only applies to "private entities."  A "private entity" is defined under the ADA as "any entity other than a public entity."  49 C.F.R. § 37.3.  Meanwhile, the definition of a "public entity" specifically includes Amtrak.  *Id.*  Therefore, the requirements of 49 C.F.R. § 37.5(f) to make "reasonable modifications" and "provid[e] auxiliary aids and services" is not relevant to this case and cannot serve as the basis for Plaintiff's claim.

Second, the ADA does not otherwise require Amtrak to provide Plaintiff with a wheelchair or inform her that the decision to transfer from a wheelchair to a seat is hers. *See generally* 49 U.S.C. Part 37; *Katzowitz, supra; Adiutori, supra*.  The ADA only prohibits an entity from requiring a passenger to transfer from a wheelchair to a seat, 49 C.F.R. § 37.165(e), and it is undisputed that Plaintiff did not ask to remain in the wheelchair.  (Plaintiff dep., pp. 47-48).

### 3.  Amtrak Did Not Violate the ADA By Not Assisting Plaintiff to the Restroom.

Plaintiff alleges that Amtrak violated the ADA by not assisting her to the restroom.  (Amended Complaint, ¶¶ 49, 51, 52).  The ADA, however, does not require Amtrak to assist disabled passengers to the restrooms.  *See generally* 49 C.F.R. Part 37. Furthermore, there is no evidence that Plaintiff informed Amtrak of her need to use the restroom before she attempted to walk to the restroom using her cane.  Therefore, even if the ADA contained such a requirement, Plaintiff never requested any assistance prior to her fall.  *See Katzowitz, supra; Adiutori, supra*.  Accordingly, Amtrak did not violate the ADA by not assisting Plaintiff to the restroom.

-13-

    **4.**       **Amtrak Did Not Violate the ADA by Maintaining a Policy that Requires a Passenger to be Accompanied by a Caregiver if the Passenger Cannot Tend to His or Her Most Basic Needs, Such as Eating, Using the Restroom and Taking Medication.**

Plaintiff's expert contends that Amtrak's policy requiring a passenger who cannot take care of his or her most basic needs to be accompanied by an attendant violates the ADA. (Einstein dep., pp. 94-105). Amtrak's policy does not violate the ADA and, in any event, it is not relevant to this case. 49 C.F.R. § 37.5(e) states that "[a]n entity shall not require that an individual with disabilities be accompanied by an attendant." However, the Department of Transportation's interpretation of this regulation specifically states that "[a]n entity is not required to provide attendant services (e.g., assistance in toileting, feeding, dressing), etc." Appendix D to 49 C.F.R. Part 37 - Construction and Interpretation of Provisions of 49 CFR Part 37. Therefore, it is not a violation of the ADA to require a passenger to be accompanied by a caregiver if the passenger cannot perform "attendant services."

In any event, even if this policy constituted a violation of the ADA, it is irrelevant to Plaintiff's claims as Plaintiff was allowed to board the train without a caregiver. Therefore, she was not discriminated against on the basis of this policy as even her own expert admits. (Einstein dep., pp. 97-105 ("So she wasn't discriminated against on the basis of this particular policy, but nonetheless, I'm pointing out that this is one of eight ADA violations in your client's policy.")).

-14-

     **5.**     **Amtrak Did Not Violate the ADA By Not Allowing Companions of Disabled Passengers to Purchase a Ticket at a 50% Discount.**

Neither Plaintiff nor her expert has identified a provision of the ADA that required Amtrak to provide a 50% discount to companions of disabled passengers. (Einstein dep., pp. 26, 105-06).  In addition, there is no evidence that Plaintiff would have been accompanied by a caregiver if a 50% discount was offered.  (Einstein dep., p. 106 ("Now I don't know whether or not ... someone might have accompanied her.")).  In fact, Audain testified that when she put her mother on the train to Savannah she was confident her mother could complete the trip safely and did not need a companion.  (Audain dep., p. 65).  Therefore, Amtrak's failure to offer a 50% discount to companions of disabled passengers does not violate the ADA and is irrelevant to this case.

     **6.**     **Amtrak Did Not Violate the ADA by Not Providing the Plaintiff with a Call Button or Some Other Means to Summon Assistance from the Train Crew.**

Plaintiff contends that Amtrak violated the ADA by not providing her with a call button or some other means to summon assistance.  (Amended Complaint ¶ 53; Einstein dep., pp. 111-117).  The ADA does not require a call button or any particular communications to take place between its employees and Plaintiff regarding assistance that may be available.  *See generally* 49 C.F.R. Part 37; (Einstein dep., p. 132). Nevertheless, Plaintiff's expert contends that Amtrak violated the ADA because it allegedly provided a call button in its sleeper cars but not in its coach cars.  (Einstein dep., pp. 111-12).  Einstein contends that this constitutes discrimination under the ADA because disabled passengers who purchase a ticket for a sleeper car receive a higher level

of service than those that purchase a ticket for a coach car.  (Einstein dep., pp. 112-13).

Einstein admits that this constitutes discrimination on the basis of financial means rather

than disability, but still contends it is actionable under the ADA.  (Einstein dep., p. 113).

Discrimination on the basis of financial means is not actionable under the ADA.

Instead, the ADA prohibits discrimination on the basis of disability.  *See* 42 U.S.C. §

12101(b) (stating that the ADA's purpose is "to provide a clear and comprehensive

national mandate for the elimination of discrimination against individuals with

disabilities."); 42 U.S.C. § 12132 ("Subject to the provisions of this subchapter, no

qualified individual with a disability shall, by reason of such disability, be excluded from

participation in or be denied the benefits of the services, programs, or activities of a

public entity, or be subjected to discrimination by any such entity."); 49 C.F.R. § 37.5.

Accordingly, any claim that Amtrak discriminated against Plaintiff on the basis of

financial means by not providing her with a call button or some other means of

communication should be dismissed.  *See Weinrich v. Los Angeles County Metropolitan*

*Transp. Authority,* 114 F.3d 976 (9th Cir. 1997) (holding that discrimination on the basis

of financial circumstances is not actionable discrimination under the ADA).

In addition, Plaintiff never informed Amtrak of her incontinence and never

requested a means to communicate with Amtrak in the event she needed to use the

restroom urgently.  Therefore, she should not be allowed to complain after the fact about

the failure of Amtrak to provide a service that she did not request.  *See Katzowitz, supra;*

*Adiutori, supra.*

-16-

**7.    Amtrak Did Not Violate the ADA By Failing to Provide a Readily Accessible Restroom on the Plaintiff's Car.**

Any claim that Amtrak failed to provide a readily accessible restroom should be dismissed because there is no evidence of a violation and it is not relevant to Plaintiff's claims.  Plaintiff did not reach the restroom, so any alleged violation of the ADA's accessibility requirements for restrooms is unrelated to Plaintiff's fall.

**8.    Amtrak Did Not Violate the ADA By Failing to Train its Employees to Proficiency.**

Plaintiff alleges that Amtrak violated the ADA by not training its employees "to proficiency."  (Amended Complaint, ¶ 55; Einstein dep., pp. 172-73).  49 C.F.R. § 37.173 states that "[e]ach public or private entity which operates a fixed route demand responsive system shall ensure that personnel are trained to proficiency, as appropriate to their duties, so that they operate vehicles and equipment safely and properly assist and treat individuals with disabilities who use the service in a respectful and courteous way, with appropriate attention to the difference among individuals with disabilities."  This provision was not violated for two reasons.

First, there is no evidence that the train or any equipment was operated unsafely. There is also no evidence that Amtrak's employees failed to assist and treat Plaintiff "in a respectful and courteous way, with appropriate attention to the difference among individuals with disabilities."  49 C.F.R. § 37.173.

Second, the evidence shows that training was provided to Amtrak's employees, including the very training recommended by the Department of Transportation.  Amtrak's employees receive annual training on dealing with disabled and special needs passengers.

(Jackson dep., pp. 31-32; Clark, pp. 52-53).  Plaintiff's expert on Amtrak's rules and

procedures testified that Amtrak, as well as the other railroads, provides extensive

training to its employees throughout their employment on its rules.  (Meizinger dep., p.

14).  On at least one occasion, assistant conductor Jackson testified that the training was

conducted by disabled persons, which is recommended by the Department of

Transportation.  (Jackson dep., p. 32; Appendix D to 49 C.F.R. Part 37 (recommending

that transportation providers interact with the disability community to develop

appropriate training and citing examples of entities that have used persons with

disabilities to provide training).  Amtrak's employees are also required to keep a copy of

the service manual onboard the train at all times, which contains a chapter on dealing

with disabled passengers.  (Jackson dep., pp. 6-7).  Therefore, the evidence shows that

this provision was not violated.[3]

### D.    There Is No Evidence Of Intentional Discrimination.

Plaintiff's ADA and RA claims should also be dismissed because there is no

evidence of intentional discrimination by Amtrak.  Indeed, there is no evidence that an

Amtrak official was aware of any of the alleged violations, much less evidence that he or

she failed to address the violations.  At most, Plaintiff's allegations consist of isolated

ADA violations that do not rise to the level of deliberate indifference.  Accordingly, even

if Plaintiff could demonstrate an ADA violation, any such claim should still be dismissed

because she cannot meet the high burden of showing intentional discrimination.

---

[3]

Because Plaintiff cannot demonstrate any ADA violations, her claim for injunctive relief
should also be dismissed.

## II.____Plaintiff Cannot State a Claim for Negligence Per Se Based on the ADA or the RA.

_____Plaintiff alleges a claim for negligence *per se* based on the alleged violations of the ADA and RA. As explained above, there is no evidence that the ADA or RA was violated in this case. Plaintiff's claim should also be dismissed because she cannot satisfy the elements of a claim for negligence *per se*.

Because Plaintiff's alleged injury occurred in North Carolina, Plaintiff's negligence *per se* and negligence claims are governed by North Carolina law. *Dowis v. Mud Slingers, Inc.,* 279 Ga. 808 (2005) (holding that the substantive law of the state where the alleged tort occurred governs a tort action under the tradition rule of *lex loci delicti*). In order to prevail on a claim of negligence *per se* under North Carolina law, plaintiff must show:

> (1) a duty created by a statute or ordinance; (2) that the statute or ordinance was enacted to protect a class of persons which includes the plaintiff; (3) a breach of the statutory duty; (4) that the injury sustained was suffered by an interest which the statute protected; (5) that the injury was of the nature contemplated in the statute; and, (6) that the violation of the statute proximately caused the injury.

*Rudd v. Electrolux Corp.*, 982 F. Supp. 355, 365 (1997) (citing *Baldwin v. GTE South, Inc.*, 335 N.C. 544, 439 S.E.2d 108 (1994)). The North Carolina Supreme Court has emphasized that negligence *per se* applies only when the statue violated is a public safety statute. *See Stein v. Asheville City Bd. Of Educ.*, 360 N.C. 321, 326, 626 S.E.2d 263, 266 (2006) (" '[T]he general rule in North Carolina is that the violation of a [public safety statute] constitutes negligence *per se*.' ") (quoting *Byers v. Standard Concrete Prods. Co.*, 268 N.C. 518, 521, 151 S.E.2d 38, 40 (1966)); *Hart v. Ivey*, 332 N.C. 299, 303, 420

S.E.2d 174, 177 (1992) ("A member of a class protected by a public safety statute has a claim against anyone who violates such a statute when the violation is a proximate cause of injury to the claimant."). A statute is a public safety statute if it "imposes a duty on a person for the protection of others." *Hart*, 332 N.C. at 303.

In *James v. Peter Pan Transportation Management Inc.,* 1999 WL 735173 (E.D. N.C. Jan. 20, 1999), the district court considered whether the ADA could serve as the basis for a claim for negligence *per se* under North Carolina law. In holding that it could not, the Court stated: "The ADA was enacted 'to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities.' 42 U.S.C. § 12101(b) (1994). Therefore, it is unlikely that the North Carolina courts would find that the ADA is a safety statute or that violation of the ADA constitutes negligence *per se*." *Id.* at *9.

Similarly, in *White v. NCL America, Inc.,* 2006 WL 1042548, *5 (S.D. Fla. March 8, 2006), the district court held that "[b]ecause the ADA was not designed to protect those with disabilities from personal injuries, Plaintiff is unable to state a claim for *per se* negligence.... While protection from injury for the disabled is no doubt a fortunate by-product of the ADA, it is clear that the statute was not designed with that purpose in mind and therefore the Court declines to impose a *per se* duty on cruise ships based on the ADA. "

_____As the district courts held in *James* and *White*, the ADA "was not designed to protect those with disabilities from personal injuries." Therefore, it is not a "safety

statute" and cannot serve as the basis for a claim of negligence *per se* under North Carolina law.

### III.    Plaintiff's Negligence Claim Should Be Dismissed.

Summary judgment should be granted on Plaintiff's negligence claim because it was not foreseeable to Amtrak that Plaintiff would attempt to walk to the restroom without seeking assistance from an Amtrak employee.  Under North Carolina law, "common carriers owe a duty 'to provide for the safe conveyance of their passengers as far as human care and foresight can go.'" *Bridges v. Parish,* 742 S.E.2d 794 (N.C. 2013) (quoting *Smith v. Camel City Cab Co.*, 42 S.E.2d 657, 658 (N.C. 1947)).  "While this is the standard of care imposed in such cases, it is also well recognized here and elsewhere that these companies are not insurers of the safety of passengers, and are not liable for injuries which, in the exercise of such care, their conductors, employés, agents, etc., could not have reasonably foreseen and prevented."  *Mills v. Atlantic Coast Line R.R.*, 172 N.C. 266 (1916).  "The carrier is not required to forsee and guard the passenger against all injuries, but only against such as from the circumstances may reasonably be expected to occur."  *Pruett v. Southern Ry. Co.*, 164 N.C. 3 (1913).

"To a disabled passenger, a common carrier has a duty to use such additional care or to render such aid for his or her safety and welfare as is reasonably required by the passenger's disability and the existing circumstances, provided that the common carrier's employees knew or should reasonably have known of the passenger's disability."  *Kasper v. Metropolitan Transp. Authority Long Island Bus*, 90 A.D.3d 998, 999, 935 N.Y.S.2d 645, 647 (N.Y. 2011) (affirming grant of summary judgment where defendant was not

aware of the plaintiff's disability); *see also, e.g., Ricks v. City of Monroe,* 26 So.3d 858, 862 (La. Ct. App. 2009) (stating that a common carrier does not owe a heightened duty to a disabled passenger unless the disability "has somehow been made known to the carrier, and must be one of sufficient seriousness to make assistance necessary under the circumstances presented.").

_____Plaintiff's negligence claim should be dismissed because Amtrak was not aware that Plaintiff needed assistance to the restroom before she fell.  Even if it is assumed for purposes this motion that Amtrak was aware of Plaintiff's mobility issues, it is undisputed that Amtrak was not aware of Plaintiff's incontinence or that she needed to go to the restroom before she stood up from her seat to walk to the restroom.  Therefore, Amtrak was not aware that Plaintiff required assistance at the time she fell or, most importantly, that Plaintiff had a condition that might require her to need to use the restroom urgently.  Without this information, Amtrak could not take the actions (e.g., assist her to the restroom) that Plaintiff claims should have been taken.  Amtrak cannot be held liable, even under the common carrier negligence standard, when it was not aware that Plaintiff required assistance.  Otherwise, Amtrak would become an insurer for its passengers who are injured while on an Amtrak train.  Accordingly, Plaintiff's negligence claim should be dismissed.

## <u>CONCLUSION</u>

For the reasons set forth above, Defendant National Railroad Passenger Corporation ("Amtrak") respectfully requests that the Court enter an Order granting summary judgment in its favor on all of Plaintiff's claims.

This 28th day of March, 2014.

*/s/ Jay C. Traynham*  
Jay C. Traynham  
Ga. Bar Number: 716231  
Attorney for Defendant

Hall, Bloch, Garland & Meyer, LLP  
577 Mulberry Street, Suite 1500  
Post Office Box 5088  
Macon, GA 31208-5088  
Telephone: (478) 745-1625  
Email: jaytraynham@hbgm.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 28, 2014, I electronically filed the foregoing

**BRIEF IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY**

**JUDGMENT** with the Clerk of Court using the CM/ECF system, which will

automatically send email notification of such filing to the following attorney of record:

Noble L. Boykin, Jr.
Jones, Boykin & Associates, P.C.
213 East 38th Street
Savannah, Georgia 31401
*Attorney for Plaintiff*

This 28th day of March, 2014.

/s/ Jay C. Traynham
Jay C. Traynham
Ga. Bar Number: 716231
Attorney for Defendant

Hall, Bloch, Garland & Meyer, LLP
577 Mulberry Street, Suite 1500
Post Office Box 5088
Macon, GA 31208-5088
Telephone: (478) 745-1625
Email: jaytraynham@hbgm.com