**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF GEORGIA**
**SAVANNAH DIVISION**

| | | |
|---|---|---|
| MARY MCCLEOD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO.:  CV413-057 |
| | ) | |
| NATIONAL RAILROAD PASSENGER | ) | |
| CORPORATION, D/B/A AMTRAK | ) | |
| NATIONAL PASSENGER CORP. | ) | |
| (AMTRAK), | ) | |
| Defendant. | ) | |

**BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

COMES NOW, the Plaintiff, Mary McCleod, and files this Brief in Opposition to Defendant's Motion for Summary Judgment, as follows:

I.   <u>OPERATIVE FACTS</u>

The facts, when taken in the light most favorable to the Plaintiff, as opponent of the Motion for Summary Judgment, are as follows:

In February, 2011, Plaintiff Mary McCleod, then 75 years of age, went to Virginia to stay with her adult daughter who was recuperating from an illness.   Ms. McCleod is a widow, as is her daughter.   Her daughter also cares for an adult child with Downs Syndrome, and Ms. McCleod, being worried about her, traveled to Virginia to help however she could.  (Doc. 46, pp. 11-12; Doc. 48, pp. 26-27)

Ms. McCleod traveled from Savannah to Union Station in Washington, D.C., by Amtrak.  This was her first trip on an Amtrak train in over ten years. (Doc. 48, pg. 21) Ms. McCleod's daughter in Savannah, Valerie, arranged her trip with Amtrak.  (Doc. 48, pp. 26-29)

Ms. McCleod, though traveling to Virginia to assist her daughter, Felicia Audain, was herself not free from physical infirmities.   She, again, was 75 years of age, had arthritis in her knees and back, suffered from chronic back pain, and had undergone two surgeries to her cervical spine and one heart surgery.  She suffered some degree of vertigo with balance problems and also had diabetes and high blood pressure.  (Doc. 46, pp. 17, 22-27, 37,; Doc. 48, pp. 15-16, 20-21, 32-33)  She also suffered some numbness in her feet.   As a result, she had difficulty walking long distances, standing long periods of time, climbing stairs, and with dizziness including difficulty when getting up from a chair.   (Doc. 46, pp. 17-18; Doc. 48, pp. 25, 30-31, 82)  She walked using a cane, and at times a walker.  If called upon to walk for any substantial distance she would sometimes utilize a wheelchair.  (Doc. 48, pp. 25, 30-31, 36, 40-41, 45, 73-74)

Ms. McCleod also suffered from some degree of incontinence or "frequency" of urination, but to her recollection, only went to the restroom one time on the trip from Savannah to Virginia. (Doc. 48, pp. 27-28)   She recalls that the train stopped at certain stations and that at one station it was announced that would be an opportune time for passengers to utilize the facilities.   She did not recall, however, if that was when she went to the restroom or if she walked to the bathroom while the train was in motion.  (Doc. 48, pp. 80-81)  In either event, did not have a particular problem on the trip to Virginia and that trip was essentially uneventful.   It should also be noted that trip to Virginia was during morning and early afternoon hours and Ms. McCleod recalled that a number of Amtrak employees walked past her seat on a periodic basis on that trip.  (Doc. 48, pp. 26-27, 38, 80)

After staying with her daughter, Felicia, in Leesburg, Virginia, for about one month, her daughter got better and Ms. McCleod decided it was time to return to

Savannah.   She had been in Virginia since early February and planned on departing March 8. (Doc. 48, p. 26)

Her daughter in Virginia, Felicia, telephoned Amtrak to purchase the ticket for her mother through Amtrak reservations.   She spoke to a male Amtrak employee on the phone.  (Doc. 46, pp. 29-33)

She explained generally that her mother was 74-75 years of age, would be traveling alone, had difficulty walking, difficulty with her balance and used a cane.  (Doc. 46, p. 29)  She said she also told the Amtrak reservation person that her mother would need a wheelchair.  (Doc. 46, pp. 29, 49-51)   He responded that she would be provided a wheelchair at Union Station and that she should not have any concerns because the wheelchair would travel with her mother all the way to Savannah.  (Doc. 46, pp. 29-32) Though they did not discuss whether her mother would be required to remain in the wheelchair during the trip, she was led to believe that Amtrak would "take care of" her mother from "Point A", Union Station, to "Point B", Savannah.  (Doc. 46, pp. 29-33, 60-61, 68-69)  They also discussed the fact that she did not want a sleeper car (Doc. 46, pp. 54-55, 56), that she would not need a meal, but that she would need assistance if she needed to walk or move about.  (Doc. 46, pp. 52-53)

Ms. Audain's son drove Ms. McCleod, accompanied by Ms. Audain, from Leesburg to the train station in Washington, D.C.   Due to traffic problems, the trip, which was usually takes an hour, took 3-1/2 hours.   They arrived at Union Station between 6:30-7:00 p.m. and the train was set to depart sometime between 7:00 and 8:00 p.m.  (Doc. 46, pp. 38-39)

She and Ms. McCleod were dropped off in front of the station and they walked to the ticket counter which was a relatively short distance away.  Ms. McCleod used her cane while walking into the station.  (Doc. 46, pp. 41-42)

When they got to the ticket counter, there was a female at the counter. According to Ms. McCleod and her daughter, this woman at the ticket counter appeared to be "a little irritable".  (Doc. 46, p. 43)  As Ms. McCleod put it, it seemed as if she was ready to "go home".   (Doc. 48, pp. 43-45)

They informed the lady that Ms. McCleod had a reservation and that they had called ahead and ordered a wheelchair.  (Doc. 46, p. 44)  The lady told them that they were late, too late to have Ms. McCleod's bags checked in. (Doc. 46, p. 44)  The lady at first indicated Ms. McCleod was also too late to be accommodated on that trip, but an Amtrak porter or "red cap", by coincidence, happened to go by with a wheelchair and the ticket clerk indicated that he could take Ms. McCleod to the train.  (Doc. 46, p. 48; Doc. 48, p. 40)  Ms. Audain stated that she did not notice on the printed ticket any reference to a disability but that she was not accustomed to looking at such tickets and assumed that everything was fine because she had been assured that Ms. McCleod would be treated as a disabled passenger when she made the reservation. (Doc. 46, p. 47)

Ms. Audain was not allowed to go past the ticket counter, and as such, the Amtrak red cap rolled Ms. McCleod toward the train and her bags were taken on a cart. (Doc. 46, p. 49)

At the train, it is undisputed that the red cap did not allow Ms. McCleod to stay in the wheelchair even though the reservation clerk had indicated to Ms. Audain that the wheelchair would go with Ms. McCleod on the train.  (Doc. 46, pp. 29-32)  Instead, the

red cap told her that she needed to vacate the wheelchair and climb the stairs of the car.  The red cap and another individual from the train then helped Ms. McCleod up the stairs and showed her to a seat reserved for persons with disabilities which was one of the seats closest to the bathroom. (Doc. 48, pp. 46-48, 67)   It is undisputed that Ms. McCleod was not given the choice of whether to remain in the wheelchair as opposed to being seated in a coach seat, and the wheelchair was not placed on the train with her. (Doc. 57, pp. 25-28)   She testified that it would have been her preference to stay in the wheelchair on the trip home but that she was not given that option.  (Doc 48, p. 47)

Ms. McCleod testified she was never given any instructions or information in regard to what to do if she needed to get up from her seat to go to the restroom or for any other purpose.   It must be recalled that this was going to be a long trip, taking approximately 12 hours, leaving around 8:00 p.m. on March 8, 2011, and due to arrive in Savannah sometime after 8:00 a.m. on March 9, 2011.  (Doc. 28, para. 10)

Importantly, Ms. McCleod was not informed that Amtrak had assistance available when disabled passengers are required to leave their seat to go to the restroom.   (Doc. 48, pp. 49, 50-51, 63-64)  Specifically, she was not informed that Amtrak employees have a duty under their rules to assist disabled passengers in walking from their seats to the restroom, and vice versa.  (Doc. 48, pp. 49, 50-51, 63, 64)  She was also not informed of any method by which to summon assistance, if needed.

Moreover, Ms. McCleod testified that she noticed no Amtrak employees walk past her in that car after the conductor collected the tickets just after the train departed Washington and no one from Amtrak approached her or said anything to her during the trip.  (Doc. 28, para. 16, 18, 46; Doc. 48, pp. 63, 80)  Further, there was no call button or bell in the car, or other means by which to communicate with the train crew though

the testimony is that some sleeper cars have them and other cars have had them in the past, and that there is no obvious reason as to why the cars on this train did not have such buttons.  (Doc. 28, para. 30, 53; Doc. 57, pp. 49, 59-60, 62; Doc. 45-1, pp. 29-30, 42)

It is alleged, and there is evidence of record to establish that essentially Ms. McCleod was told nothing and offered nothing by Amtrak on the trip after being shown to her seat even though she, through her daughter, specifically informed the Amtrak reservations clerk that she was a person with disabilities, even though she was obviously a person with difficulty ambulating using a cane, and even though Amtrak employees had taken her across the station in a wheelchair, helped her up the stairs, and placed her in a seat for persons with disabilities.  (Doc. 28, para. 16, 18, 46)

There was also evidence in the record that when Ms. McCleod boarded the train, with an obvious problem with ambulation, that the Amtrak train attendant or conductor should at that point have realized she had a disability and special needs and placed a "green card" placard on top of her seat (which was a seat for disabled passengers in any event)  to clearly identify her as a person with special needs or disabilities so that the train crew would know to check on her more frequently.  (Doc. 57, pp. 84-85, 90, 96-97; Doc. 45-1, pp. 14-15)  However, according to the conductor, her name did not appear on the train manifest as having a disability nor did her ticket so reflect and neither of the conductors recalled her having a green card placed on her seat.

The Assistant Conductor, Jarrad Jackson, testified that if Ms. McCleod purchased a ticket and had at that time asked for red cap wheelchair assistance in the station, which obviously occurred in this case, then the ticket agent should have made an entry in the system regarding her status so it would appear on her ticket and the

6

manifest in regard to her special needs.  He opined that there must have been a

"problem in the system" where someone didn't do what they were supposed to do, for

this to have occurred.  (Doc. 45-1, pp. 44-45)

To compound the problem, there was only one train attendant on duty for the four

Amtrak coach cars after 9:00 p.m. and there is testimony that attendant, during a portion

of the trip, would have been "seated" in another coach car.  (Doc. 45-1, pp. 25, 36)  The

two conductors testified that when Ms. McCleod was injured they were seated at a table

in the café car.  (Doc. 45-1, pp. 24, 33; Doc. 57, p. 67)  Plaintiff's expert, Robert

Meizinger, the former head of the Jacksonville crew base for Amtrak, testified that the

single train attendant who was on duty that night, according to the practice at Amtrak,

should not have been sitting down on his shift and should have instead been walking

the train as he is required to do every twenty to  thirty minutes.  (Doc. 46, pp. 86-87,

105-106, 110)   He also testified, and the Amtrak rules provide, that the train attendant

should have told Ms. McCleod of the fact that assistance would be available for her to

leave her seat to walk to the restroom and should have made frequent checks on her as

she obviously had a disability.

## II.   MS. MCCLEOD'S FALL

After leaving Washington and commencing the trip, sometime after midnight, into

the early morning hours of March 9, Plaintiff determined that she needed go to the

restroom which was located some distance from her seat.   In order to reach the

restroom she would have to venture past the fixed seats and thereupon traverse an

open area, devoid of handrails, which open area separated the fixed seats from the

restrooms. (Doc. 28, para. 17; Doc. 48, pp. 53-56)

Again, there was no attendant in the car, nor had there been since the tickets were collected some hours earlier, and in any event, Ms. McCleod had not been informed, and had no idea, that Amtrak train attendants would accompany disabled passengers, such as herself, from their seats to the restroom.  As such, even had such attendants been in the car, which they were not, she would not have known to ask them for this service in any event. (Doc. 48, pp. 63, 80)  This was in marked contrast to the train crew which had been on the daytime trip from Savannah to Washington, which crew passed through, to her recollection, regularly.  (Doc. 48, pp. 63, 80)  Notably, on this trip from Washington to Savannah, Ms. McCleod's coach car had essentially emptied out at Richmond, Virginia, except for she and a couple of other people who were also scheduled to get off before the final destination of the train.  (Doc. 48, pp. 66-67)

In any event, Plaintiff,  not knowing that any assistance would be available, and having seen no Amtrak employees for more than an hour, concluded that she could not hold out any longer in regard to going to the restroom.   Thereupon, she got out of the seat and proceeded to walk toward the restroom using her cane.  (Doc. 28, para. 19; Doc. 48, pp. 52-56)   She made it across the open area beyond the rows of seats, and arrived at restroom door at the end of the car.   However, she found that the restroom was locked, or occupied, and that she would have to wait.  As there was nothing to hold onto,  she then turned to go to a second restroom which was across the aisle. However, as Plaintiff turned toward that restroom, the car bumped or "lurched", reportedly running across a "crossover" in the track,  causing Ms. McCleod to lose her balance and fall to the floor.  (Doc. 48, pp. 53-56; Doc. 59-1, p. 42 of 42)  Upon falling, as referenced above, Ms. McCleod was seriously injured, fracturing her right femur near

8

the hip, struck her head, sustaining a concussion, aggravated a pre-existing condition in her neck, right arm and low back, as well as other injuries.   She underwent emergency surgery at Wake-Med Hospital in Raleigh, NC, to set the fractured femur with placement of hardware and remains substantially injured to date.

III.   <u>AMTRAK SERVICE PROTOCOLS</u>

Amtrak had promulgated service standards for onboard  employees of Amtrak, consisting of protocols as to what assistance should be provided to disabled passengers on Amtrak trains as of the date and time of Ms. McCleod's fall.    Applicable standards in effect as of that time are as follows:

1.   <u>Communication to passengers</u>

"It is the crew's responsibilities to talk to the passengers about train safety and answer any questions they may have, **help passengers become familiar with the features and services that Amtrak trains have to offer**."  (emphasis supplied) (Doc. 59, p. 17 of 45(f)); Onboard Service Manual, Chapter 1, p. 30)

"Seniors – Be aware that senior passengers may hesitate to request needed assistance.   Always ask."   (Doc. 57-1, p. 32 of 38, para. 28)

"ADA Passengers – **Be sure to give special attention to passengers with special needs. 'How may I assist you?'**" (emphasis supplied) (Doc. 57-1, p. 32 of 38, para. 29)

"Availability – Always let passengers know where you are located."  (Doc. 57-1, p. 33 of 38, para. 35)

"Assistance – **Step forward and offer assistance to passengers before they ask for help.**" (emphasis supplied)  (Doc. 57-1, p. 36 of 38, para. 77)

9

"Amtrak employees will explain our services and related requirements to all passengers." (Doc. 58-1, p. 25 of 31)

"Ask the passenger, 'will you need any assistance during the trip?'" (Doc. 58-2, p. 9 of 34, 2(d).

"(A)sk how you can assist the passenger and offer that requested assistance. Communicate clearly through each step of the assistance process. (Doc. 58-2, p. 8 of 34; handbook p. 11-17(F)(1))

Amtrak employees shall "**explain available services and restroom locations**." (Doc. 58-2, p. 2 of 34; handbook p. 11-11(1))   Employees are also frequently to check on the passenger to ensure they are comfortable and enjoying the trip.   *Id.* (emphasis supplied)

2.   Duties specifically for the disabled

Aside from any statutory duty under the Americans with Disabilities Act, which will be discussed later in this Brief, the handbook itself also sets forth protocols which Amtrak employees were required to follow in regard to disabled passengers which, by Amtrak's own characterization, are in certain respects more stringent than the requirements of the Americans with Disabilities Act. (Doc. 57, pp. 95-96; Doc. 58, p. 25 of 31)

Under the protocols regarding persons with disabilities, Amtrak recognizes that people are considered disabled if they have a "physical impairment that substantially limits one or more major life activities such as walking, caring for oneself, or working, as well as persons with a record of such physical or mental impairments. (Doc. 58-1, p. 23 of 31, para. A(1))   Those passengers using a cane, walker or wheelchair are considered as requiring a mobility device for ambulation." (Doc. 58-1, p. 30 of 31;

10

handbook p. 11-8(2)(d))   Of course Amtrak has not contested Ms. McCleod's status as a disabled passenger on this motion.

In this regard, Amtrak warrants that it will not discriminate against people with disabilities, and will not exclude or deny a disabled person the benefit of any services that are available to the general public.  (Doc. 58-1, p. 24 of 31, para. 2d)

As to assistance in reaching restrooms or otherwise leaving the seat on a train during the trip, "all employees will:  **assist passengers in moving about the train** (e.g., transferring to and from wheelchairs or **moving to and from restrooms**)".  (emphasis supplied)   (Doc. 58-2, p. 2 of 34; handbook 11-11(1))

Amtrak's handbook indicates that  "if it becomes apparent that an onboard passenger is not able to transfer from his/her wheelchair to a toilet without assistance, employees are to assist the passenger to the restroom…" though they are not required to enter the restroom to render such assistance.  (Doc. 58-1, p. 27 of 31; handbook, p. 11-5(b))

"**All employees are to 'assist disabled passengers** with meal service, **movement to** a feature car (if requested), **restroom**, etc." (Doc. 57-2, p. 7 of 30; handbook p. 6-20(2)(e))   (emphasis supplied)

3.   Green Seat Check Placards

So as to doubly ensure that Amtrak employees offer assistance to disabled passengers and explain services to them, the conductor is required to place a "Keep in Sight" green card on the back of the seat of passengers with special needs or disabilities.  Such cards are emblazoned the with words 'Keep in Sight' and are "used for any…passenger who is unable to hear announcements or needs special attention." These special green seat checks are to be placed on the seat of a disabled passenger

"to remind employees that these passengers need to be individually kept informed."

(Doc. 58-2, p. 2 of 34; handbook p. 11-11(1))

In fact, so there is no confusion, Amtrak requires that "passengers who need assistance (whether disabled or not) are to have the green (Keep in Sight) 'Special Assistance Seat Check' placed with the destination seat check above their seat."  (Doc. 58-2, p. 1 of 34; Doc. 11-10(e))

Moreover, conductors are responsible for conducting "seat checks" to determine if green cards are properly and appropriately placed and to check on any needs of the person in that seat as they go by on their rounds.  In this regard, the conductor is required to walk the entire train "at least every thirty minutes."  (Doc. 57-2, p. 15 of 30) Similarly, the coach train attendants are required to inspect the cars within their responsibility every thirty minutes.  (Doc. 58-1, p. 5 of 31; handbook, p. 6-76(d))  (See also, Doc. 46, pp. 86-87, 105-106)

4.    Transfer to a seat from a wheelchair

As to whether an Amtrak employee may require a passenger to transfer from a wheelchair into a fixed seat on the train, the protocols speak to that as well.  "A passenger who uses a wheelchair,…may choose to travel in the chair, or transfer to a fixed seat instead of the wheelchair."  (Doc. 58-1, p. 28 of 31; handbook, p. 11-6(c)(1)) Further, "whenever a passenger chooses to transfer to a fixed seat, their wheelchair or mobility aid...shall travel in the same car as the passenger and be stored as close to their seat as is possible."  (Doc. 58-2, p. 30 of 31; handbook, p. 11-8(3))

No distinction is made in the handbook between a passenger using a wheelchair supplied by Amtrak as opposed to one that is supplied or owned by the passenger.

12

IV.   <u>AMTRAK'S ARGUMENT</u>

The above requirements for train crew members were acknowledged on deposition by both the conductor and assistant conductor on the train in question.  (Doc. 57, pp. 51-59, 70-73, 95-100; Doc. 45-1, pp. 36, 40)

On deposition, Bradley Williams was asked to assume that Ms. McCleod's version of the vents was true to the effect that the train attendant for that car assisted the red cap in helping Ms. McCleod from the wheelchair and up the steps of the car and then placed her in a seat for disabled passengers on the train.  Mr. Williams testified that assuming those facts to be true, that the train attendant should at that point have realized that Ms. McCleod had a disability or special needs, and, should thereupon have explained to her that he or other Amtrak employees would provide assistance to her as required by the rules if she needed to leave her seat, such as to visit the restroom.   He testified that if the train attendant, under such circumstances, did not tell her about such services then, in his opinion, the train attendant violated the above rules.  (Doc. 57, pp. 101-102)

Conductor Williams also confirmed that a passenger who is known to have a disability should be checked on regularly and should have the green "Keep in Sight" placard on her seat.  (Doc. 57, pp. 37-39, 97-98, 99)   Further, he testified that the only way a disabled passenger would know to ask for assistance to go to the restroom would be for that passenger to have been informed that such a service was available by Amtrak employees. (Doc. 57, p. 105)

By contrast, Jaqueline Clark, the manager of Union Station in Washington, and Lauren Anderson, a train master for Amtrak, were identified by Amtrak as having knowledge in this case, though on deposition they admitted that they had never ever

13

heard of the case or Ms. McCleod until approximately one week before their depositions this past February.  In their testimony, they attempted, in Plaintiff's estimation, to varnish over any alleged rule violations testifying generally that if Ms. McCleod was not listed on the manifest as being disabled, and if her disability wasn't noted on the ticket, then the train crew would have had no duty to approach her, to inquire as to her needs or offer her any assistance whatsoever. They implied that any such inquiry by the train crew may have been insensitive or embarrassing to Ms. McCleod.  (Doc. 54, pp. 33-34, 38-39, 40-45, 68-71, 79-83)  Incredibly, she finally testified that she wasn't sure what would have to appear on the manifest in terms of letters or codes in order to trigger the crew to be required to offer assistance to the passenger from his or her seat to the restroom. She then testified that probably the ticket or manifest should actually say on it that the person needs help getting from his or her seat to the restroom before such services will be required.  (Doc. 54, pp. 83-85)   Again, this is the Train Master who is over all of the conductors in that area of the east coast.  Interestingly, Train Master Anderson also acknowledged that if a disabled passenger gets to the station somewhat late, their disabled status may not appear on the ticket or the manifest even though they are in fact disabled (Doc. 54, pp. 47-48), and thus those passengers would simply be out of luck.

Plaintiff would respectfully submit that the not only is the above testimony contrary to the testimony of the Conductor and Assistant Conductor on the train in regard to the applicability of the rules, same is also contrary to common sense.

This is especially true when it is recalled that Ms. McCleod's disability status was apparently not entered in Amtrak's system so as to be printed on ticket and the manifest due to the fault of the Amtrak employees in failing to do so when Ms. McCleod and her

14

daughter, on two separate occasions, requested that Ms. McCleod be provided with wheelchair assistance because of her difficulty with ambulation, climbing, balance, and the like.   Again, Ms. Audain, Ms. McCleod's daughter, testified that she did tell the reservation clerk on the phone that Ms. McCleod would need assistance in moving about the train and in response, the reservation clerk told her that they would take "good care" of Ms. McCleod and that the wheelchair would travel with her all the way to Savannah. (Doc. 46, pp. 30-32; 51-52)

As such, Amtrak's argument flies in the face of the facts, as mentioned above, to the effect that Ms. McCleod had an obvious disability, used a cane, asked for a wheelchair, was assisted by two Amtrak employees up the stairs of the car, was 75 years of age, and was seated in a seat for handicapped passengers.  Again, even the conductor, Bradley Williams, admitted that these would be sufficient facts to give rise to the duty by the train crew to treat Ms. McCleod as a passenger with disabilities under Amtrak's rules. (Doc. 57, pp. 101-102)

6.    Testimony of plaintiff's expert, Robert Meizinger

Robert Meizinger was retained, among other reasons, to counter any such arguments or interpretation of the rules on the part of Amtrak.

In this regard, Robert Meizinger, is a former Amtrak manager for the "crew base" in Jacksonville, Florida, now retired.  In that capacity, he managed all onboard service crew members for Amtrak trains, including the train attendants for this very route, from Miami to New York.   At that time, he managed 200-250 Amtrak service personnel. (Doc. 50, Exh. 1; Doc. 49, pp. 21-22)

In that position, he was extremely familiar with the rules at Amtrak to be followed by Amtrak onboard train employees in regard to the assistance of disabled passengers

15

on Amtrak trains. He testified as to his experience and knowledge in that regard, included his continued familiarity with the Amtrak handbook for onboard service employees in effect as of the date of the incident in question. (Doc. 49, pp. 16, 26-27, 30-32, 39-43, 48-51, 56-59, 97,106)

In a nutshell, Mr. Meizinger testified that the crew, under the rules, had an affirmative duty to initiate an exchange with a passenger who either indicates they have special needs or who obviously appears to have special needs or disabilities regardless of whether the manifest or ticket shows them to be disabled. He emphasized the importance of the Amtrak crew in communicating with the passengers and specifically informing them of the right to assistance in moving about the car while on the train, as is clearly spelled out in the handbook. (Doc. 49, pp. 74-76)

Mr. Meizinger also testified that though the duty to effectively communicate the availability of Amtrak's services for the disabled applied to all Amtrak trains, this was, in his opinion, especially important on Amtrak lines south of Washington, D.C.. In this regard, south of Washington the Amtrak trains run on freight tracks, which do not always have welded rail as they do in the northeast corridors, and the ride south of Washington is many times is much rougher. (Doc.49, p. 100) He further emphasized the need of the crew to walk through and make themselves available to such passengers on a regular basis with special attention being given to disabled passengers or passengers sitting in seats with green "Keep in Sight" placards. Similarly, he testified that the train attendants should continue to walk the cars, especially when there was only one train attendant available for four cars, as was the case on Ms. McCleod's train, and that the train attendant should not merely sit down in a car and ride during the trip. (Doc. 49, p. 110)

Finally, Mr. Meizinger testified that if a passenger is in a wheelchair, whether supplied by Amtrak or otherwise, if that passenger wants to remain in the wheelchair for the remainder of the trip, he or she should be allowed to do so and that there is no good reason not to.  (Doc. 49, pp. 66-67, 11-112)

VI.    THE CLAIMS

Plaintiff asserted a claim based on common law negligence alleging that Amtrak was negligent in failing to inform Plaintiff that assistance was available if she needed to leave her seat to go to the restroom,  in failing to provide such assistance, in failing to inform Plaintiff how to summon such assistance, and in failing to have employees regularly walk through the car to offer assistance and check on Ms. McCleod as a disabled passenger, and "in other ways which will be established through the evidence at trial." (Doc. 28, para. 31)   Plaintiff also alleged that Amtrak was negligent in failing to accommodate her disability as they had promised and as required by Amtrak rules, when they required her to vacate the wheelchair at the station before she boarded the train. (Doc. 28, para. 31)  Finally, in Count III, Plaintiff alleged claims against Amtrak under the Americans with Disabilities Act (Title II) and the Rehabilitation Act (Count III) arising out of essentially the same operative facts.

**ARGUMENT AND CITATION OF AUTHORITY**

1.    State Law Negligence Claim

Plaintiff has set forth in detail, above, various violations by Amtrak of its own rules and protocols owed to passengers generally, and disabled passengers in particular.   This includes Amtrak's own rules which exist over and above any provisions

of the Americans with Disabilities Act, which latter statute will be addressed elsewhere in this Brief.

In Part III (pg. 21), of Defendant's Brief, Amtrak argues that summary judgment should be granted on Plaintiff's negligence claim on the issue of "foreseeability" in that Amtrak was unaware that Ms. McCleod "would attempt to walk to the restroom without seeking assistance from an Amtrak employee."

Is it really Amtrak's position that it could not foresee that a 74-year old, traveling alone, may reasonably attempt to get up and leave her seat to go to the restroom on a 12-hour train trip when no Amtrak attendant, according to the testimony of Ms. McCleod, came through the car after departing Washington some four hours earlier?  Is it not foreseeable that a 74-year old, who is required to use a cane, who required wheelchair assistance in the station and help up the stairs, and who was seated in a seat for disabled, may fall if Amtrak failed to provide available assistance her to reach the restroom during the trip in a moving train car?   The testimony is undisputed that train cars, even during normal operation, will typically rock and sway when in motion and travel at approximately 79 miles per hour. (Doc. 54, pp. 53-55) (Doc. 57, p. 81) There is also testimony that the ride on Amtrak trains south of Washington is particularly rough because Amtrak runs on freight tracks south of Washington, not the smooth welded-rail commuter tracks as found in the Northeast.  (Doc. 49, p. 100)  It is also undisputed that Ms. McCleod testified that the car she was in rocked or "lurched" causing her to lose her balance and fall.  (Doc. 47, pp. 53-55, 61-67; see also, Mary McCleod's affidavit)  This testimony was corroborated by that of the Assistant Conductor, Jarrad Jackson, who said Ms. McCleod indicated that she had fallen when the car "lurched".  (Doc. 45-1, pp. 34, 37; Doc. 57, pp. 77-78)

18

Next, Defendant, on pg. 5 of its Brief, argues that when Ms. McCleod was placed in the seat for disabled passengers by the train attendant, that she at that point told him that she needed nothing else, and that she "was good".  To the contrary, what Ms. McCleod testified is that when she was placed in her seat, she did not at that point ask for anything else.  What is omitted by Defendant in its quote from the deposition is as follows: "Q:  Did you ask that gentleman (the conductor) for any special assistance? A:  I didn't know I could ask him anything."  (Doc. 48, pp. 49-50)  Moreover, she certainly did not testify that she remained "good" for the remainder of the 12-hour trip while trapped in her seat with no means of reaching the restroom.  (Doc. 48, p. 50)

Further, the North Carolina decisions cited by Defendant in support of its motion for summary judgment on the issue of negligence, in fact work against Amtrak on the issue of foreseeability.  North Carolina decisions are relied upon by the Defendant in that Ms. McCleod's injury occurred while the train was passing through North Carolina.

"Common carriers owe a  'duty' to provide for a safe conveyance of their passengers as far as human care and foresight can go."  _Bridges v. Parish_, 742 S.E.2d 794 (NC 2013).  The carrier of passengers, though not insurers of their safety, are liable for those injuries which the common carrier of passengers could have reasonably foreseen and which may reasonably be expected to occur.  _Mills v. Atlantic Coastline RR_, 172 NC 266 (1916); _Pruett v. Southern RW Co.,_ 164 NC 3 (1913).

It has also been stated in North Carolina that a carrier of passengers owes a duty to those passengers, when the carrier knows of a danger, or knows of the facts and circumstances for which a danger may be reasonably anticipated, "to exercise the greatest practicable care, the highest degree of prudence, and the utmost human skill

and foresight which have been demonstrated by experience to be practicable." _Wesley_

_v. Greyhound Lines, Inc._, 47 NC App. 480 (268 S.E.2d 855)(1980), quoting _Daniel v._

_RR_, 117 NC 592 602 (23 S.E. 327)(1895). [1]

The law in Georgia is substantially the same as that quoted above from North

Carolina.  The rule in Georgia is that "a carrier of passengers must exercise

extraordinary diligence to protect the lives and person of its passengers…."  O.C.G.A. §

46-9-132; _Bennett v. Central of Georgia RY,_ 6 Ga. App. 185 (64 S.E. 700)(1909).  "At

common law and by statute, a carrier of passengers is bound to use extraordinary

diligence to protect the passengers from injury…."  _Adams, Georgia Law of Torts_

(2013-2014 Ed) Sec. 3:3, pg. 106.  Whether the common carrier breached the duty of

extraordinary care and whether the Plaintiff exercised ordinary care for his/her own

safety under the circumstances, is generally held to be for jury determination.  e.g.,

_Cuthbert v. Marta_, 190 Ga. App. 550 (379 S.E.2d 413)(1989).   See also in this regard,

_Anderson v. Liberty Lobby, Inc._, 477 U.S. 242, 247 (1982); _Gross v. Southern Railway_

_Company_, 414 F.2d 292 (1962), appeal upon remand, 446 F.2d 1057;  _Ward v. Papa's_

_Pizza To Go, Inc._, 907 F.Supp. 1535 (1995, S.D. Ga.)

As to private rules, guidelines, protocols and customs of the industry, same are

generally admissible as relevant to the existence of a duty of care, and evidence of

violation of such rule has been held to be illustrative of negligence even if the violation

---

[1] Moreover, it has been held that "a Federal Court analyzing a state law claim follows state substantive law.  If there is an issue as to which state's law applies, the court will apply the law of the forum state except where the laws of the state in question differ.  (cit.)  Only when there is a difference in state laws that will affect the outcome of the case does the court need to resort to conflict of law rules…", and if the law of two states is essentially the same on a point, the court may rely on the law of the forum. _Wray v. National RR Passenger Corp._, 10 F.Supp. 2d 1036 (E.D.Wis)(1998);  _Railway Express Agency, Inc., v. Super Scale Models Ltd._, 934 F.2d 135, 139 (7th Cir. 1991).

of same will not give rise to a claim for negligence per se.  In this regard, in _Adams Georgia Law of Torts_ (2013-2014 Ed.), Sec. 3:6, p. 125, it is stated, "Privately established rules, or evidence of what is the customary practice in a given trade, may be evidence of the standard of care, and may be admitted as illustrative of negligence…(even though) the violation of such a rule or custom is not negligence per se.  For example, ANSI standards as privately established guidelines, are admissible as illustrative of negligence.   Likewise, the violation of hospital policies and procedures, though not negligence per se, is nevertheless actionable if injury results from the hospital's failure or refusal to follow them."

Plaintiff would submit that all the above questions as to whether Defendant violated its duty of extraordinary care as a common carrier owed to the Plaintiff, and as to the existence of due care on the part of the Plaintiff to avoid injury, should thus be left for jury resolution.

2.    Negligence Per Se Based Upon Alleged Violation Of The
       Americans With Disabilities Act

Plaintiff has determined **not** to assert a claim for negligence per se based upon Amtrak's violations of the ADA.   However, such violations should nonetheless be held to constitute evidence of common law/state law negligence, even if not rising to the level of negligence per se.

In this regard, Defendant, in its Brief (Doc. 37, pp. 19-21), argues that Plaintiff cannot properly assert a claim for negligence per se based upon the violation of the Americans with Disabilities Act of 1990.   In support of this proposition, Defendant Amtrak argues that the general rule in North Carolina is that a violation of a "public safety statute" may be found to constitute negligence per se in a personal injury action,

but that North Carolina courts would be "unlikely to hold that the ADA is a safety statute or that its violation constitutes negligence per se." *James v. Peter Pan Transportation Management, Inc.*, 1900 WL 735173 (E.D. NC, 1999).

Plaintiff shows that negligence <u>per se</u> based upon violations of the ADA, would in large part be cumulative to the causes of action otherwise already available to Plaintiff arising out of Amtrak's negligence under State law/common law, as set forth above.  In any event, Plaintiff concedes that the rule set forth by Defendant to the effect that violation of the Americans with Disabilities Act will not give rise to a claim for negligence <u>per se</u> is the general rule.   See, <u>Cruet v. Emory University</u>, 85 F.Supp. 2d 1353 (N.D. Ga. 2000).   As such, Plaintiff does not herein assert a claim against Amtrak for negligence <u>per se</u> arising out of violation of the Americans with Disabilities Act.

However, it has been held that violations of the Americans with Disabilities Act, even though proof of same will not give rise to a claim for negligence <u>per se</u>, may be found to constitute evidence of negligence under applicable State tort law/common law. See, <u>Lugo v. St. Nicholas Associates,</u> 2 Misc. 3rd, 212, 772 NY S.2d 449 (2003), citing as authority, <u>Smith v. Wal-Mart Stores, Inc.</u>, 167 F.3[rd] 286 (6th Cir. 1999); and <u>Theatre Management Group v. Dalgliesh</u>, 765 A 2d. 986, 991 (D.C. 2001).   Similarly, by analogy, it has been held that OSHA regulations are "admissible not merely as standards of performance, but as evidence of legal duty, violation of which may give rise to a cause of action under O.C.G.A. § 51-1-6." *Dupree v. Kelly Industries, Inc*., 199 Ga. App. 138 (404 S.E.2d 291)(1991).   Therein, the Court held that even if not applicable to establish negligence <u>per se,</u> because Plaintiff was not an employee of the Defendant, OSHA standards are admissible as evidence of common law negligence and admissible

so as to establish a legal duty.  See also, _Brantley v. Custom Sprinkler Systems_, 218

Ga. App. 431 (461 S.E.2d 592)(1999); _Smith v. CSX Transportation, Inc.,_ 306 Ga. App.

897 (703 S.E.2d 761)(2010).   See also, _Pelletier v. Zweifel,_ 921 F.2d 1465 (11th Cir.

1991), and _Jairath v. Dyer_, 961 F.Supp. 277 (N.D. Ga.)(1996).

In sum, Plaintiff concedes that the violation of Americans with Disabilities Act of

1990 will likely not give rise to a claim for negligence per se, and as such, Plaintiff does

not herein assert such a claim.   However, Plaintiff contends that evidence of such

violations would be admissible for purposes of establishing the existence of a tort duty.

Defendant having cited no North Carolina law or statute to the contrary, Plaintiff would

submit that this Court would be authorized to apply the law of the Georgia in this regard

as being the forum state for this action.

3.      Violations Of The Americans With Disabilities Act Of 1990, 42 U.S.C. § 12101 et.
        seq., And The Rehabilitation Act Of 1973, 29 U.S.C. 794 § 504

Plaintiff alleged in her Second Amended Complaint (Doc. 28, p. 10) a violation of

the Americans with Disabilities Act, Title II, Sections 12131 and 12161-12165, dealing

with public transportation and inter-city and commuter rail services.   Plaintiff also

alleged a violation of the Rehabilitation Act.   Section 12161(3) specifically defines

"inter-city rail transportation" as transportation provided by Amtrak.

As noted by the Defendant in its Brief (Doc. 37, p. 9), in order to state a claim

under Title II of the ADA, the Plaintiff must allege:  "(1)  that she is a 'qualified individual

with a disability'; (2) that she was 'excluded from participation in…or denied the benefits

of the services, programs or activities of a public entity' or otherwise 'discriminated

(against) by such entity'; (3) by reason of such disability.'"  _Shotz v. Cates_, 256 F.3d

1077, 1079 (11th Cir. 2001); _Wray v. Amtrak_, 10 F. Supp. 2d. 1036 (E.D. Wis. 1998).

As also noted by the Defendant, because claims were brought pursuant to Title II of the ADA, and because the RA (Rehabilitation Act) is "essentially identical" thereto, the Court should "consider the two statutes simultaneously". _Abertt v. Cobb County School District_, 138 F.3d 1407, 1409 (11th Cir. 1998).

Further, in order to assert a claim for compensatory damages under the Americans with Disabilities Act, as opposed to merely injunctive or other such non-compensatory relief, Plaintiff must prove that she was discriminated against intentionally or, stated otherwise, as a result of "deliberate indifference." _Liese v. Indian River County Hospital District_, 701 F.3d. 334, 344-48 (11th Cir. 2012); _Saltzman v. Board of Commissioners of North Broward Hospital District_, 239 Fed. Appx. 484, 487 (11th Cir. 2007).

"Deliberate indifference requires knowledge that a federally-protected right is likely to be harmed and a failure to act upon that likelihood." _Saltzman_, 239 F.3d 487-488. "For conduct to be deliberately indifferent, there must be both knowledge of likely harm and failure to act on part of a policy maker, that is, someone capable of making an 'official decision' on behalf of the organization." _Id._   That is, the deliberate indifference must be on the part of someone whose actions can fairly be said to represent the actions of the organization and must be someone who generally enjoys substantial supervisory authority when dealing with the complainant. _Id._

4.   The alleged violations in the Americans with Disabilities Act

As noted by Defendant in its Brief (Doc. 37, p. 11), Plaintiff claims in her Amended Complaint that the ADA was violated as follows: "**(1)** by not informing Plaintiff that assistance to the restroom was available (Amended Complaint, Doc. 28), (para. 46-49); **(2)** by not informing Plaintiff that the decision to transfer from an Amtrak-owned

wheelchair to a seat was hers (Amended Complaint, para. 47, 48, 50); **(3)** by not assisting Plaintiff to the restroom (Amended Complaint, para. 49, 51, 52); **(4)** by maintaining a policy that requires a passenger to be accompanied by a caregiver if the passenger cannot tend to his or her most basic needs, such as eating, using the restroom and taking medication (Einstein dep., pp. 94-105); **(5)** by not allowing companions of disabled passengers to purchase a ticket at a 50% discount (Einstein dep., pp. 105-11); **(6)** by not providing the Plaintiff with a call button or some other means to summon assistance from the train crew (Amended Compliant, para. 53; Einstein dep., pp. 111-117); **(7)** by failing to provide a readily accessible restroom in the Plaintiff's car (Amended Complaint, para. 40; Einstein dep., pp. 165-71); and **(8)** by failing to train its employees to proficiency.   (Amended Complaint, para. 55; Einstein dep., pp. 172-73)."

Plaintiff shows that she has determined **not** to assert claims based upon a violation of the ADA in regard to its requirement that a disabled person,  must under certain circumstances, be accompanied by a caregiver (ADA Violation No. 4) or in regard to Amtrak's not allowing such companion of a disabled passenger to purchase a ticket at a 50% discount (ADA Violation No. 5).   Plaintiff concedes that these violations are not tailored to the evidence in this case as Plaintiff requested no caregivers accompany her on this trip.   As such, Plaintiff will assert only violations as set forth above numbered 1-3 and 6-8.

a.      **(1)** <u>Failure to inform Plaintiff that assistance to reach restroom was available, **(3)** failure to assist Plaintiff in walking to the restroom, **(6)** failure to outfit the car with a call button or some other adequate means to summon assistance from the train crew, and **(7)** failure to provide a readily accessible restroom.</u>

Plaintiff will discuss all of these alleged ADA violations (1, 3, 6 and 7 respectively) regarding the failure by Amtrak to inform her of its duty to assist her in reaching the restroom, failure to provide such assistance, failing to provide a call button or other effective means of summoning assistance as she or other disabled persons may need during the trip, and in failing to properly provide a reasonably accessible restroom as constituting one topic, as in Plaintiff's estimation, all are inter-connected.

First of all, Plaintiff does not dispute that the railcar in question was equipped with an ADA-compliant restroom.  Of course the ADA requires Amtrak to provide "readily accessible" train cars with at least one "restroom useable by an individual who uses a wheelchair" and by individuals with disabilities as therein defined.  42 U.S.C., Chapter 126, Title II, § 12162; 49 C.F.R. §§ 37.91 and 37.93.  What Plaintiff does contend, however, is that Amtrak failed to provide a reasonably safe means for disabled passengers, including the Plaintiff to reach and use that restroom, thus essentially rendering that restroom no longer "readily accessible" for use by individuals with disabilities.  42 U.S.C. Chapter 126, Title II, Sec. 12162; see also, 49 C.F.R. §§ 37.91, 37.93; 49 C.F.R. § 38.111(a)(5) and 38.123.

Again, the evidence is that the Plaintiff had difficulties with walking, climbing, and balance.  She utilized a cane and required a wheelchair for walking extended distances. She was then required to vacate that wheelchair and was seated in a coach seat with only her cane for assistance.

No train attendant or conductor, according to testimony of the Plaintiff, had appeared for hours prior to her attempting to walk to the restroom and there was no call button or other means to summon an Amtrak employee to assist her even had she known that service was available.   Thus, it is Plaintiff's contention that she was faced

with the unenviable choice of either using the restroom in her clothing while seated in her seat, or to choose to "run the gauntlet" of attempting to walk unassisted across an open area of the train moving at 79 miles-per-hour.  (Doc. 57, p. 81)

Amtrak does not dispute Ms. McCleod's status as being disabled.  Instead, Amtrak essentially argues that because it had a restroom which itself was accessible once it was reached by a disabled person, that it complied with the Americans with Disabilities Act.  The point which Amtrak seems to miss is that the facilities in the restroom are not the problem, the problem being that the railcar itself was not "readily accessible and useable" by persons with disabilities if there is no safe means to reach the restroom.

In this regard, it has been said, "[o]bviously, if a handicapped person cannot safely use a facility or accommodation, access to the facility or accommodation is severely compromised.   This reality is closely akin to the actual denial of access, because if a person cannot safely use a building, then access to the building is significantly restricted and restricted access can amount to discrimination."   _Theatre Management Group v. Dalgliesh_, 765 A2d. 986, 991 (D.C. 2001); _Lugo v. St. Nicholas Associates_, 2 Misc. 3rd, 212, 772 NY S.2d 449 (2003).

Further, in order to comply with the ADA, a railcar must be "readily accessible to and **useable** by individuals with disabilities…"  42 U.S.C. § 12162(a)(1);  49 C.F.R. § 37.161(a) (emphasis supplied)

Moreover, the ADA recognizes that an accessible restroom is not "readily accessible" or "useable" by individuals with disabilities if those individuals have not been informed by the entity that the restroom exists or how to access same.   In this regard, 49 C.F.R. § 37.167(f) provides that "the entity **shall make available to individuals with**

**disabilities adequate information concerning transportation services**. This obligation includes making **adequate communication capacity** available through accessible formats and technology to enable users to obtain information and schedule same." (emphasis supplied)

Plaintiff would submit that this regulation under the circumstances at hand would require Amtrak to adequately inform passengers as to services, including how to obtain assistance in leaving their seats and reaching the facilities which facilities would otherwise not be "readily accessible" to those disabled users.

In the case at hand, Amtrak chose not to provide, for whatever reason, a call button in this particular car, even in the four seats dedicated for passengers with disabilities. Instead, in lieu of call buttons, Amtrak chose to implement a system where train attendants walk the cars every 30 minutes, day and night, and are supposed to offer assistance to disabled passengers who wish to leave their seats and walk to the restroom. Plaintiff would show that there is evidence in the record which would indicate this system was significantly flawed and on the evening in question, was flagrantly disregarded, with predictable results.

Amtrak's system is essentially based upon having a single train attendant, after 9:00 p.m., taking care of all passengers in four (4) passenger coach cars, which attendant is also responsible for cleaning the restrooms, dumping the garbage, and informing each disabled passenger on an individual basis of the services available regarding leaving their seat and reaching the restroom. They are also charged with the responsibility of actually providing such assistance. This system, if it can be so characterized, would appear on its face to be woefully inadequate and fraught with potential for bad outcomes. What if more than one disabled person needs to reach the

restroom on a single occasion?  What if the single train attendant falls asleep?   What if he or she simply cannot or does not do their job as they are required to do?

Plaintiff would submit that the finder of fact could certainly conclude based upon the above evidence that Amtrak's system in this regard falls far short of the requirement under the regulation cited above, § 37.161(f), of making "adequate information available" concerning transportation services "through accessible formats and technology."  It would appear that the system in place is more akin to the format and technology of the 19th Century rather than in the 21st.  Plaintiff would further submit that the Court should enjoin Amtrak from continuing this antiquated approach to making its railcars readily accessible by requiring either call buttons on its seats set aside for those with disabilities, or, alternatively, it should require an objective measure to ensure that the train attendants in fact provide regular and adequate assistance such as requiring a train attendant to be stationed in each car carrying a disabled passenger.   As admitted by Jarad Jackson, the Assistant Train Conductor, he believes call buttons, as found on airliners, would assist passengers and the crew alike.  (Doc. 45-1, p. 28; see also, deposition of Train Master Anderson, Doc. 54, p. 46)    Under Amtrak's system, disabled persons either "have to catch you walking by or else they'd have to find you."  (Jackson deposition, Doc. 45-1, p. 30)  This system can hardly be characterized as making restrooms "readily accessible and useable" to "the maximum extent feasible…" for the disabled.  49 C.F.R. § 37.161.

Moreover, Amtrak should be required under 49 C.F.R. § 161(f) to adequately inform all passengers, including disabled passengers, of its services available, including services available if a disabled passenger needs to leave his or her seat and walk to the restroom, "through accessible formats of technology" such as regular and uniform

recorded announcements, printed material, and/or website notification as opposed to being the responsibility of one over-worked train attendant, fit in between his myriad of other assigned tasks.  (Doc. 54, p. 67)  In short, providing such information and assistance to disabled passengers simply does not appear to be of particularly high priority at Amtrak.

Further, it is undisputed that all persons deposed on the part of Amtrak from the Assistant Train Conductor up through the Train Master over a substantial area of the lines on the east coast, testified that if a person who has a disability does not voice the fact that they have a disability to the train crew or such disabled status does not reflect on the manifest, then the crew is free to essentially ignore that person even if that person is seated in a handicap-accessible seat.  (Doc. 54, pp. 33-39, 40-45, 68-71, 79-83)

Plaintiff would submit that the above could be found by the finder of fact as constituting a systematic and deliberate indifference to the rights of disabled persons under the Americans with Disabilities Act in regard to failing to make restrooms available for use by an individual with disabilities and failing to make same "readily accessible and useable by individuals with a disability…to the maximum extent feasible…," 49 C.F.R. § 37.161, thus entitling Plaintiff to assert a claim for compensatory damages as well as injunctive relief.

b.    Failing to allow Plaintiff to remain in the Amtrak-supplied wheelchair (ADA violation No. 2)

Section 37.91(a)(1) requires each train to have "available a number of spaces to park wheelchairs (to accommodate individuals who wish to remain in their wheelchairs)…."  At 49 C.F.R. § 37.165, under the section, "Provision of Services", it is

30

provided:  "(e) **The entity may recommend to a user of a wheelchair that the
individual transfer to a vehicle seat.   The entity may not require the individual to
transfer.**"  (emphasis supplied)  Of course this mirrors Amtrak's own rule in its service
manual as referenced above.  (Doc. 58-1, p. 28 of 31)

It is undisputed that Amtrak provides wheelchair assistance for passengers in the
station's terminal as they did for Ms. McCleod.   It is also undisputed, however, that
Amtrak requires such wheelchair users to vacate those Amtrak-supplied wheelchairs at
the door of the train and those users are then required to transfer to a seat unless that
passenger has brought his or her own wheelchair with them.

Plaintiff would submit this violates Amtrak's own rules as referenced, and
blatantly violates the Americans with Disabilities Act requirement that Amtrak may
"recommend"  that a wheelchair user transfer to a seat on the train but cannot "require"
it.  It also violates the rule that passengers are allowed to be transported on the train in
wheelchairs if they, "wish to remain in their wheelchair."  49 C.F.R. § 37.165

Amtrak argues that because Plaintiff did "not ask to remain in the wheelchair", in
the face of being told to move out of it, that the above provisions are not violated.   Ms.
McCleod testified, however, that it would have been her preference to have remained in
the wheelchair for the trip but she was not given that choice.   Moreover, contrary to this
argument, it is undisputed by Amtrak that passengers are given no choice in regard to
whether to remain in or vacate Amtrak wheelchairs once the passenger reaches the
train.  Incredibly, Amtrak admits in its own Brief that no one is ever gets to remain in an
Amtrak wheelchair once they reach the train.  "When a passenger is provided with an
Amtrak-owned wheelchair in the station, the passenger is required to return the
wheelchair before boarding the train.   Williams (the Conductor) testified that he is not

31

aware of any circumstance where a passenger has been allowed to remain in an Amtrak wheelchair after the train departs from the station." (Doc. 37, p. 7)

There is absolutely nothing in the law or regulations making a distinction between a wheelchair owned by the passenger versus a wheelchair owned and supplied by Amtrak. The law and regulations indicate that "any user" of a wheelchair, without differentiation as to ownership or title to the wheelchair, should be given the choice of whether to transfer to the train seat or to remain in the wheelchair.

Further, it is undisputed that allowing the wheelchair to travel with the passenger on the train is not overly onerous on the part of Amtrak, as the testimony is that the wheelchair can come back to that particular station on another train and Amtrak can keep up with its own equipment in its own system. Again, Amtrak's own rules for onboard service employees also have the same provision to the effect that the passenger cannot be required to transfer from a wheelchair to a seat on the train. (Doc. 58-1, p. 28) Moreover, Ms. Audain, Ms. McCleod's daughter, testified that the ticket agent told her when she made the reservation that the Amtrak wheelchair would remain with Ms. McCleod on the trip to Savannah. (Doc. 48, pp. 29-32)

In sum, Plaintiff would submit that summary judgment is not appropriate as to this violation of the ADA wherein Ms. McCleod was required to transfer to a seat in the railcar and vacate the wheelchair.

Further, the above can certainly be found to constitute an intentional violation (deliberate indifference) of the ADA as Amtrak officials testified that the above is the procedure at Amtrak for requiring passengers to vacate Amtrak-owned wheelchairs, and Amtrak has so admitted in its Brief, as referenced above. (Doc. 54, pp. 37-38) Again,

32

with an intentional violation, the Plaintiff may obtain compensatory damages under the Americans with Disabilities Act.   Further, an injunction should be entered enjoining Amtrak from continuing such procedure in the future.

c.    Training to proficiency (ADA Violation No. 8)

Finally, Plaintiff contends that the Americans with Disabilities Act was violated through Amtrak's failure to train its employees to proficiency in regard to the above rules.  While Amtrak has presented evidence that its employees have received yearly training, there is clearly a question as to whether they are trained to "proficiency" as to its onboard service rules and as to the applicable provisions of the ADA as of the time of the incident.   In this regard, the Amtrak employees testified that the above violations are essentially based upon what they have been trained to do at Amtrak.   Moreover, there appears to be a substantial variation in regard to interpretation of the rules as between the onboard train crew which was deposed and the officials who were later deposed regarding when Amtrak is required to provide services to disabled passengers. (Doc. 54, pp. 33-39, 40-45, 68-71, 79-83)

The Train Master, Lauren Anderson, throughout her deposition testimony, repeatedly exhibited a general lack of knowledge as to when the rules would become applicable, and such references are throughout her deposition testimony.  (See especially, Doc. 54, pp. 19-20, 28-34, 37-39, 41-45, 47-48, 49-53, 62, 66-69, 71-85) Plaintiff would submit that a question of fact exists as to whether Amtrak employees are trained to "proficiency" in regard to the provisions of the Americans with Disabilities Act and Defendant is not entitled to summary judgment based merely on the conclusory and self-serving statement that their employees "undergo training" once a year.

33

## CONCLUSION

Based on all the above and foregoing, Plaintiff would submit that the Defendant's Motion for Summary Judgment should be denied.

Dated this 8th day of May, 2014.

**JONES, BOYKIN & ASSOCIATES, P.C.**

By:  s/Noble L. Bokin, Jr._____
     NOBLE L. BOYKIN, JR.
     Georgia State Bar Number 073400
     *Attorney for Plaintiff Mary McLeod*

213 East 38th Street
Savannah, GA  31401
(912) 236-6161
jbsalaw@comcast.net

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF GEORGIA**
**SAVANNAH DIVISION**

| | |
|---|---|
| MARY MCCLEOD )<br><br>Plaintiff,  )<br><br>v.  )<br><br>NATIONAL RAILROAD PASSENGER  )<br>CORPORATION, D/B/A AMTRAK,  )<br><br>Defendant.  ) | CIVIL ACTION NO. : CV413-057 |

## CERTIFICATE OF SERVICE

This is to certify that I have on this day served all the parties in this case in accordance with the directives from the Court  Notice of Electronic Filing ("NEF") which was generated as a result of electronic filing of *Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment.*

Submitted this 8th day of May, 2014.

JONES, BOYKIN & ASSOCIATES, P.C.

By:  s/Noble L. Boykin, Jr.
NOBLE L. BOYKIN, JR.
Georgia State Bar No. 073400
*Attorney for Plaintiff*

213 E. 38th Street
Savannah, GA  31401
(912) 236-6161
jbsalaw@comcast.net

35